# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSHUA DICKINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOBILE COUNTY, ALABAMA; | ) | |
| MOBILE COUNTY SHERIFF SAM | ) | CASE NO. 1:19-cv-00706-JB-B |
| COCHRAN; MOBILE COUNTY | ) | |
| METRO JAIL WARDEN NOAH | ) | |
| PRICE "TREY" OLIVER, III; | ) | |
| and JOHN DOE ##1-10, | ) | **JURY DEMAND** |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

## JURISDICTION AND VENUE

1.     This action arises under the Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1983.

2.     This Court has jurisdiction of plaintiff's Federal claims pursuant to 28 U.S.C. § 1331.

3.     Venue is proper under 28 U.S.C. § 1391(b), as the majority of the defendants reside in this judicial district and the events and omissions giving rise to plaintiff's claims occurred within this judicial district.

## PARTIES[1]

4.     Plaintiff Joshua Dickinson is of legal age, a citizen, and a resident of the state of Alabama and Clarke County.

5.     Defendant Mobile County, Alabama is an Alabama county. It is responsible for funding the Mobile County Metro Jail (MCMJ).

6.     Defendant Sam Cochran was the Mobile County Sheriff at all relevant times. As the sheriff, among other things, he is responsible for management of the MCMJ. Defendant has a statutory duty under Alabama law to attend to the needs of inmates in the MCMJ.

7.     Defendant Noah Price "Trey" Oliver was the MCMJ Warden at all relevant times.

8.     John Doe defendants ##1-5 were employed as correctional officers at the MCMJ and were responsible for physically placing Brown into a cell with Joshua.

9.     John Doe defendants ##6-10 were employed as correctional officers at the MCMJ and participated in the decision to place Brown in a cell with Joshua.

10.     Plaintiff sues each of the individual defendants in their individual capacity unless otherwise noted.  Each of the individual defendants acted under

---

[1]  Plaintiff intends to add more individual defendants, in particular the agents of the Sheriff whose acts are described herein but have not been identified.  Plaintiff is seeking expedited discovery to identify all potential defendants.

color of state law and within the scope of his employment when engaging in the misconduct described herein.

## FACTS

11.     On January 9, 2018, Joshua Dickinson (Joshua) was arrested for a misdemeanor domestic violence harassment charge (a non-violent offense), arising out of a dispute with his aunt during an emotional family gathering at his grandmother's hospital room.

12.     Joshua was transported to the Mobile County Metro Jail (MCMJ) in Mobile, Alabama.  He was processed through MCMJ's intake system and placed in a three-man cell which was locked down twenty-three hours a day.  Joshua was allowed out of his cell and into a wedge day room one hour a day.

13.     Joshua was assigned to this wedge and cell based upon his mental condition at the time.

14.     Joshua was issued suicide prevention garb and kept under observation as were all other detainees in this wedge.

15.     Due to his mental condition, Joshua was vulnerable to abuse by other inmates.

16.     Joshua's first cell mate was a Black male with an obvious mental condition.  The cell mate talked to himself all night, but Joshua was unable to communicate with him.  The condition of this cell mate so frightened Joshua that

he sought assistance from MCMJ personnel to see a psychiatrist but was denied the same.

17.    A second cell mate, a Hispanic male, was brought in but was held only for twenty-four hours and then released.

18.    On January 11, 2018, between 6:30 and 8:00 in the morning, a Joshua Brown (Brown) was dragged into Joshua's cell by John Doe defendants ##1-5. Brown was in a rage and fighting with these correctional officer defendants.

19.    Brown was fighting with police officers as he was brought into MCMJ and had been fighting with correctional officers since his arrival at MCMJ.

20.    Brown stated so that all could hear his intention to do violence.

21.    John Doe defendants ##1-5 were each aware that Brown was currently violent and was a present danger to other inmates.

22.    These defendants were also responsible for searching Brown.

23.    Because of Brown's violence, these defendants, acting with deliberate indifference and contrary to MCMJ policy, did not thoroughly search Brown.

24.    As a result, when Brown was dragged into the cell with Joshua and the Black male inmate, Brown had a knife.

25.    Brown was well known to the correctional staff at MCMJ prior to January 11, 2018.

26.    Brown was a convicted murderer who had spent years in the state prison system.

27.     Brown's status as a convicted murderer was recorded on his MCMJ record and was known to John Doe defendants ##6-10, the correctional officers who participated in assigning Brown to a cell with Joshua.

28.     These defendants were also aware that Brown was a habitual criminal who, since his murder conviction, had been arrested multiple times, including on drug and theft charges.

29.     These defendants knew that during his prior incarcerations in MCMJ, Brown was known to be a violent and difficult inmate.

30.     These defendants were also aware that Brown was currently violent and a danger to other inmates and that Joshua was not a violent inmate.

31.     Even without the prior murder conviction (and other history), it would have been obvious to any correctional officer that Brown, a violent, out-of-control inmate, should never have been housed with **any** other inmate, let alone first-time, non-violent arrestee Joshua.

32.     That MCMJ correctional staff housed Brown with Joshua was a gross deviation from correctional standards and indicates a fundamental failure in MCMJ policies and procedures.

33.     This gross deviation was known to and participated in by numerous correctional officers, including John Doe defendants ##1-5 and John Doe defendants ##6-10.

34.     After Brown was placed in the cell, Joshua turned his back on the others and began to do pushups against the wall when suddenly he was hit across the back of the head.  As Joshua turned around, Brown attacked him with a switchblade, or some other commercially-made knife, and stabbed Joshua in the right shoulder.

35.     Joshua attempted to fight back and punched Brown away from him. Brown then stabbed Joshua in the left shoulder.

36.     Brown also attempted to stab Joshua in the chest, and Joshua received more, serious stab wounds.

37.     At some point, the cell door was opened and the two emerged, struggling, into the day room.

38.     Correctional officers were called to the wedge at this point and a Taser was used on both Joshua and Brown.  Joshua found himself lying in a huge pool of his own blood as he lost consciousness.

39.     Joshua was taken to the University of South Alabama Medical Center where he was treated and his wounds were sutured.

40.     Joshua was returned to MCMJ and placed in a cell by himself.

41.     The next morning, Joshua was bonded out by his mother.

42.     Joshua suffered traumatic and serious physical and emotional injuries as a result of the assault.

43.     Shortly following Joshua's release from MCMJ, he suffered an emotional breakdown.  He was taken to the Clark County Jail and thereafter was probated and committed to Brown-Whitfield Hospital, a mental institution in Demopolis, Alabama.  Joshua suffered such severe emotional distress, rage, and anger due to the attack that it contributed to his hospitalization and his commitment in Demopolis.  This hospitalization was a direct result of the Defendants' violations of Joshua's Fourteenth Amendment rights.

44.     In the months that followed, Joshua was contacted by the Mobile County District Attorney, Ashley Rich, in order to assist the District Attorney's office in the prosecution of Brown.  After initially interviewing Joshua and preparing for trial, prosecutors stopped contacting him.  Joshua is unaware of the outcome of the case against Brown.

45.     The county commission is charged with maintaining jails and each county is required to maintain a jail of sufficient size and strength to secure the prisoners.  Ala. Code (1975) §§ 11-14-10, 11-14-13.  The counties' duties to "maintain a jail" under Ala. Code (1975) § 11-14-10 requires that it keep the "jail and all equipment therein in a state of repair and to preserve it from failure or decline." *Keeton v. Fayette County*, 558 So.2d 884, 886 (Ala. 1989).  The Alabama Code provides for the counties to remain informed about conditions in the jails.  The county commission has the authority to inspect the jail without notice to the sheriff.  Ala. Code § 11-14-22 (1989).

46.     Despite Joshua's vulnerability and lack of a serious criminal history, Joshua was housed with violent inmates, including a convicted murder currently in a fit of rage and violence, Joshua Brown, who on or about January 11, 2018, brutally attacked plaintiff, including stabbing him multiple times.

47.     During the news coverage of the attack upon Joshua, Trey Oliver, the Warden of MCMJ, stated that a contributing cause for the assault on Joshua with a knife was inadequate physical space for inmates being processed into MCMJ, a problem of which the Mobile County Commission had been aware for years.

48.     The physical plant of MCMJ is so inadequately built and/or maintained that adequate searches cannot not be made of the incoming inmates.

49.     The failure of the Mobile County Commission to correct this facility problem was a proximate cause of Brown's attack on Joshua with a knife.

50.     The more fundamental problems, however, are that MCMJ is housing more inmates than it can safely and that Cochran and Oliver, acting with deliberate indifference, have failed to adequately implement a proper classification system and take other measures to reduce inmate-on-inmate violence, failures that have been exacerbated by the overcrowding situation.

51.     As a 2009 U.S. Department of Justice letter to Cochran stated, "[a] meaningful classification system is even more important in crowded facilities like MCMJ."

52.     At that time MCMJ averaged 1,000 to 1,300 inmates monthly.

53.     The 2009 DOJ letter described this population level as rendering MCMJ "dangerously overcrowded."

54.     Currently, MCMJ routinely houses over 1500 inmates.

55.     That MCMJ is "dangerously overcrowded" has been known to the county's policymakers (and to Cochran and Oliver) for many years (well prior to the 2009 DOJ letter).

56.     The County's policymakers and Cochran and Oliver have long recognized that the current MCMJ facilities are inadequate to safely house the inmate population.

57.     Nevertheless, neither the County nor Cochran and Oliver have taken adequate steps to address the extreme housing crisis at MCMJ.

58.     The 2009 DOJ letter also put Cochran and Oliver on notice regarding the inadequacy of MCMJ's classification system and an ongoing problem with inmate-on-inmate violence.

59.     Despite being on notice that MCMJ lacked "a meaningful classification system" and suffered from an ongoing inmate-on-inmate violence problem, Cochran and Oliver, acting with deliberate indifference, have failed and refused to implement an appropriate classification system and to take adequate measures to reduce violence (such as increasing shakedowns for contraband, including weapons).

60.     Further, from the 2009 DOJ letter and otherwise, Cochran and Oliver were on notice of a need to train correctional officers regarding the classification of inmates.

61.     Currently, inmates are routinely housed without regard to their level of dangerousness.

62.     The failure to implement a proper classification system and take other measures to control inmate-on-inmate violence are policies and customs of Cochran and Oliver and directly led to the assault on Joshua by Brown.

63.     Even after the assault on Brown, Cochran and Oliver have failed and refused to take the necessary steps to keep inmates safe. Acting with deliberate indifference, they failed and refused to implement a proper classification system, take other steps to reduce inmate-on-inmate violence, and adequately train correctional officers regarding classification issues.

64.     On February 3, 2012, police officer Steven Green was stabbed and killed by arrestee Lawrence Wallace Jr. in the sally port of MCMJ.

65.     On January 30, 2018, shortly after the assault on Joshua, another inmate was stabbed by an inmate, Greg Hackett, after being housed at MCMJ for two weeks.

66.     As recently as August 24, 2019, an inmate arrested on a ticket and minor drug charges was housed with a murderer, who stabbed him with a foot-long "shank" when the inmate refused to yield his bunk to the murderer.

67.     Over the years leading up to Joshua's stabbing, inmates have been routinely stabbed or otherwise injured by weapons used by other inmates at MCMJ.

68.     For many years, MCMJ has been routinely housing far more inmates than it safely could.

69.     Because of the limitations of the facilities, MCMJ personnel are limited in their ability to protect non-violent inmates from dangerous inmates.

70.     These limitations were known to Defendants for an extended period. Nevertheless, with deliberate indifference, Defendants have not addressed the problems.

71.     Long before the assault, Cochran, Oliver, and others, were aware that assaults were a serious problem.  Defendants Cochran and Oliver, acting with deliberate indifference, routinely housed dangerous inmates in crowded conditions with non-violent inmates like Joshua.

72.     Defendants Cochran and Oliver, acting with deliberate indifference, established an unreasonable and longstanding policy of not identifying and segregating inmates known or likely to be perpetrators of assaults.

73.     The MCMJ was both dangerously overcrowded and dangerously understaffed at the time plaintiff was attacked, putting inmates such as Joshua at substantial risk of harm.

74.     Nevertheless, defendants Cochran and Oliver failed to promulgate, implement, and enforce adequate policies, procedures, and practices necessary to adequately supervise and monitor the housing units to maintain the safety of inmates therein.

## CLAIMS

### Count I – 42 U.S.C § 1983
### Failure to Protect
### (Against Mobile County, Cochran, Oliver, and John Doe ##1-10)

75.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

76.     Pursuant to the Fourteenth Amendment of the United States Constitution, plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in MCMJ.

77.     Defendants, acting individually and in conspiracy with other defendants, failed to protect plaintiff.

78.     Defendants knew of and consciously disregarded the substantial risk that plaintiff would be injured while incarcerated, failing to protect him from harm.

79.     The misconduct described in this count was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of plaintiff and others and was objectively unreasonable.

80.     Defendants' misconduct directly and proximately caused plaintiff to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal assault and its devastating aftermath.

**Count II - § 1983 Failure to Train, Staff and Supervise**
**(Against Cochran and Oliver)**

81.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

82.     Sheriff Sam Cochran and Warden Trey Oliver as a matter of policy and practice and with deliberate indifference, failed to properly train, assign, and supervise correctional officers and Joshua was damaged as a result the aforesaid conduct.

83.     Upon information and belief, Cochran and Oliver were the final repositories of authority for the purposes of training and supervising staff to insure proper classification, cell assignment, medical care, and timely release of detainees.  Their deliberate indifference to the dangers posed by these failures gave rise to Joshua's injuries.

84.     Cochran and Oliver violated Joshua's Constitutional rights and are liable under 42 U.S.C. § 1983.

## RELIEF SOUGHT

85.    As relief, plaintiff seeks the following:

a.    Permit Plaintiff expedited discovery to allow the identification of all potential defendants.

b.    Appropriate declaratory and injunctive relief to remedy the unlawful policies and customs at MCMJ;

c.    That plaintiff be awarded such compensatory damages as a jury shall determine from the evidence plaintiff is entitled to recover;

d.    That plaintiff be awarded against the individual defendants only such punitive damages as a jury shall determine from the evidence plaintiff is entitled to recover;

e.    That plaintiff be awarded prejudgment and post-judgment interest at the highest rates allowed by law;

f.    That plaintiff be awarded the costs of this action, reasonable attorney's fees, and reasonable expert witness fees;

g.    That plaintiff be awarded such other and further relief to which plaintiff is justly entitled.

Jury Demand

Plaintiff requests a trial by jury.

14

Respectfully submitted this 12th day of November, 2019.

> *s/ Henry Brewster*
> Henry Brewster (BREWH7737)
> HENRY BREWSTER, LLC
> 205 North Conception Street
> Mobile, Alabama  36602
> Tel:  251-338-0630
> Email:  hbrewster@brewsterlaw.net
>
>
> *s/ Henry F. (Hank) Sherrod III*
> Henry F. (Hank) Sherrod III(SHERH1200)
> HENRY F. SHERROD III, P.C.
> 119 South Court Street
> Florence, Alabama 35630
> Phone: 256-764-4141
> Fax: 877-684-0802
> Email: hank@alcivilrights.com
>
> ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that on the 12th day of November, 2019, the foregoing document

was filed using CM/ECF system which will send notice to all parties:

| | |
|---|---|
| Jay M. Ross | K. Paul Carbo, Jr. |
| Jay.ross@arlaw.com | Paul.carbo@atchisonlaw.com |
| | |
| Neal C. Townsend | Michael M. Linder, Jr. |
| Neal.townsend@arlaw.com | Michael.linder@atchisonlaw.com |

*/s/Henry Brewster*

15