IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JOSHUA DICKINSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MOBILE COUNTY, ALABAMA; ) | |
| MOBILE COUNTY SHERIFF SAM ) | CASE NO. 1:19-cv-00706-JB-B |
| COCHRAN; MOBILE COUNTY ) | |
| METRO JAIL WARDEN NOAH ) | |
| PRICE "TREY" OLIVER, III; ) | |
| and JOHN DOE ##1-10, ) | **JURY DEMAND** |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S RESPONSE TO THE MOTIONS
TO DISMISS OF DEFENDANTS COCHRAN, OLIVER,
AND MOBILE COUNTY, ALABAMA**

Plaintiff responds as follows to the motions to dismiss filed by defendants:

INTRODUCTION

When plaintiff Joshua Dickinson (Joshua) was booked into the Mobile County Metro Jail (MCMJ) on January 9, 2018, he was a first-time arrestee charged with a minor, non-violent offense, who was suffering from a mental breakdown that rendered him vulnerable to other inmates. [Second Amended Complaint ¶¶11-15, PageID.141] Nevertheless, the following morning, detention officers placed Joshua Brown (Brown), an inmate with a long history of violence at the jail and otherwise, including a murder conviction, who was in a violent fit at the time, into Joshua's

1

cell. Brown promptly assaulted Joshua with a knife he had somehow secreted into his cell. [Second Amended Complaint ¶¶18-30, PageID.142-43]

The assault occurred not only because of the deliberate indifference of jail personnel working the morning of January 10, 2018, but also because of the deliberate indifference of Cochran and Oliver and Mobile County policymakers, who had been on notice since at least 2009 of systemic issues leading to avoidable incidents of inmate-on-inmate violence, yet failed to act. [Second Amended Complaint ¶¶51-63, PageID.146-48]

Accordingly, defendants' motions to dismiss are due to be denied.

## FACTS

Regarding the deliberate indifference of Cochran and Oliver and Mobile County policymakers, plaintiff alleged as follows:

45. The county commission is charged with maintaining jails and each county is required to maintain a jail of sufficient size and strength to secure the prisoners. Ala. Code (1975) §§ 11-14-10, 11-14-13. The counties' duties to "maintain a jail" under Ala. Code (1975) § 11-14-10 requires that it keep the "jail and all equipment therein in a state of repair and to preserve it from failure or decline." *Keeton v. Fayette County*, 558 So.2d 884, 886 (Ala. 1989). The Alabama Code provides for the counties to remain informed about conditions in the jails. The county commission has the authority to inspect the jail without notice to the sheriff. Ala. Code § 11-14-22 (1989).

46. Despite Joshua's vulnerability and lack of a serious criminal history, Joshua was housed with violent inmates, including a convicted murder currently in a fit of rage and violence, Joshua Brown, who on or about January 11, 2018, brutally attacked plaintiff, including stabbing him multiple times.

2

47. During the news coverage of the attack upon Joshua, Trey Oliver, the Warden of MCMJ, stated that a contributing cause for the assault on Joshua with a knife was inadequate physical space for inmates being processed into MCMJ, a problem of which the Mobile County Commission had been aware for years.

48. The physical plant of MCMJ is so inadequately built and/or maintained that adequate searches cannot not be made of the incoming inmates.

49. The failure of the Mobile County Commission to correct this facility problem was a proximate cause of Brown's attack on Joshua with a knife.

50. The more fundamental problems, however, are that MCMJ is housing more inmates than it can safely and that Cochran and Oliver, acting with deliberate indifference, have failed to adequately implement a proper classification system and take other measures to reduce inmate-on-inmate violence, failures that have been exacerbated by the overcrowding situation.

51. As a 2009 U.S. Department of Justice letter to Cochran stated, "[a] meaningful classification system is even more important in crowded facilities like MCMJ."

52. At that time MCMJ averaged 1,000 to 1,300 inmates monthly.

53. The 2009 DOJ letter described this population level as rendering MCMJ "dangerously overcrowded."

54. Currently, MCMJ routinely houses over 1500 inmates.

55. That MCMJ is "dangerously overcrowded" has been known to the county's policymakers (and to Cochran and Oliver) for many years (well prior to the 2009 DOJ letter).

56. The County's policymakers and Cochran and Oliver have long recognized that the current MCMJ facilities are inadequate to safely house the inmate population.

57. Nevertheless, neither the County nor Cochran and Oliver have taken adequate steps to address the extreme housing crisis at MCMJ.

58. The 2009 DOJ letter also put Cochran and Oliver on notice regarding the inadequacy of MCMJ's classification system and an ongoing problem with inmate-on-inmate violence.

59. Despite being on notice that MCMJ lacked "a meaningful classification system" and suffered from an ongoing inmate-on-inmate violence problem, Cochran and Oliver, acting with deliberate indifference, have failed and

refused to implement an appropriate classification system and to take adequate measures to reduce violence (such as increasing shakedowns for contraband, including weapons).

60. Further, from the 2009 DOJ letter and otherwise, Cochran and Oliver were on notice of a need to train correctional officers regarding the classification of inmates.

61. Currently, inmates are routinely housed without regard to their level of dangerousness.

62. The failure to implement a proper classification system and take other measures to control inmate-on-inmate violence are policies and customs of Cochran and Oliver and directly led to the assault on Joshua by Brown.

63. Even after the assault on Brown, Cochran and Oliver have failed and refused to take the necessary steps to keep inmates safe. Acting with deliberate indifference, they failed and refused to implement a proper classification system, take other steps to reduce inmate-on-inmate violence, and adequately train correctional officers regarding classification issues.

64. On February 3, 2012, police officer Steven Green was stabbed and killed by arrestee Lawrence Wallace Jr. in the sally port of MCMJ.

65. On January 30, 2018, shortly after the assault on Joshua, another inmate was stabbed by an inmate, Greg Hackett, after being housed at MCMJ for two weeks.

66. As recently as August 24, 2019, an inmate arrested on a ticket and minor drug charges was housed with a murderer, who stabbed him with a foot-long "shank" when the inmate refused to yield his bunk to the murderer.

67. Over the years leading up to Joshua's stabbing, inmates have been routinely stabbed or otherwise injured by weapons used by other inmates at MCMJ.

68. For many years, MCMJ has been routinely housing far more inmates than it safely could.

69. Because of the limitations of the facilities, MCMJ personnel are limited in their ability to protect non-violent inmates from dangerous inmates.

70. These limitations were known to Defendants for an extended period. Nevertheless, with deliberate indifference, Defendants have not addressed the problems.

71. Long before the assault, Cochran, Oliver, and others, were aware that assaults were a serious problem. Defendants Cochran and Oliver, acting with deliberate indifference, routinely housed dangerous inmates in crowded conditions with non-violent inmates like Joshua.

72. Defendants Cochran and Oliver, acting with deliberate indifference, established an unreasonable and longstanding policy of not identifying and segregating inmates known or likely to be perpetrators of assaults.

73. The MCMJ was both dangerously overcrowded and dangerously understaffed at the time plaintiff was attacked, putting inmates such as Joshua at substantial risk of harm.

74. Nevertheless, defendants Cochran and Oliver failed to promulgate, implement, and enforce adequate policies, procedures, and practices necessary to adequately supervise and monitor the housing units to maintain the safety of inmates therein.

[Second Amended Complaint ¶¶ 45-74, PageID.145-50]

## ARGUMENT

### A. Plaintiff is Not Required to Prove His Case in the Complaint, Only to Allege a Facially Plausible Claim.

At the motion to dismiss stage, a plaintiff is not required to prove his or her case. Rather, a plaintiff is only required to allege a facially plausible claim. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not include "detailed factual allegations," though it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1974 (2007). Of course, on a motion to dismiss, the Court must accept plaintiff's

allegations as true and draw all reasonable inferences in plaintiff's favor. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006).

In a decision reversing a district court's dismissal of the plaintiff's supervisory liability claim, the Eleventh Circuit summarized the standard as follows:

> To survive a motion to dismiss, Mr. Lane's complaint must have set out facts sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This means he must have alleged "factual content that allow[ed] the court to draw the reasonable inference that the defendant[s] [were] liable for the misconduct." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The allegations must be plausible, but plausibility is not probability. *See id.*

*Lane v. Philbin*, 835 F.3d 1302, 1305 (11th Cir. 2016)

### B. Plaintiff Has Plausibly Alleged a Supervisory Liability Claim Against Cochran and Oliver.

The Eighth (or here, the Fourteenth) Amendment imposes a duty on officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *see also Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has a constitutional right to be protected . . . from physical assault by other inmates."). "A prison official violates the Eighth Amendment when he actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner." *Rodriguez v. Secretary for the Department of Corrections*, 508 F.3d 611, 617 (11th Cir. 2007)

6

(citing *Farmer*, 511 U.S. at 829, 837, 844; *Lane v. Philbin*, 835 F.3d 1302 (11th Cir. 2016); *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003); *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582–83 (11th Cir.1995)).

To state an Eighth (Fourteenth) Amendment[1] claim of deliberate indifference, Joshua must allege facts sufficient to show "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Lane*, 835 F.3d at 1307 (quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995)).

Regarding the subjective knowledge element, Joshua is only required to "allege[] sufficient facts . . . to make it plausible that the defendants had knowledge of the substantial risk of serious harm he faced." *Id.* A plaintiff is not required to allege that jail officials "knew of, participated in, encouraged, or witnessed a particular assault to defeat qualified immunity" or that jail officials were aware that the plaintiff was at risk from the particular inmate who committed the assault. *Q.F. v. Daniel*, 768 Fed. Appx. 936, 946 (11th Cir. 2019). Rather, it is sufficient for

---

[1] The Supreme Court has held that an objective standard governs excessive force claims asserted by pretrial detainees. *Kingsley v. Hendrickson*, 135 S.Ct. 2446 (2015). It is plaintiff's position that *Kingsley* fatally undermines the reasoning and holdings of prior case law applying Eighth Amendment standards to pretrial detainees like plaintiff. The Eleventh Circuit, nevertheless, has continued to apply Eighth Amendment standards outside of the specific context addressed in *Kingsley* (officer assaults on inmates). *See Dang by and through Dang v. Sheriff, Seminole County Florida*, 856 F.3d 842, 850 n.1 (11th Cir. 2017) (medical care). Plaintiff reserves the right to seek a change in the law on appeal.

plaintiff to allege knowledge of "an excessive risk of inmate-on-inmate violence at a jail." *Harrison v. Culver*, 746 F.3d 1288, 1299 (11th Cir. 2014).

"Inference from circumstantial evidence, however, can be used to show that a prison official possessed the necessary knowledge." *Lane*, 835 F.3d at 1308 (quoting *Caldwell v. Warden SCI Talledega*, 748 F.3d 1090, 1099 (11th Cir. 2014)).

There are two types of risks of which a supervisory defendant can be subjectively aware: <u>general</u> threats posed by the jail environment known to the defendant and <u>specific</u> threats where official is placed on knowledge that someone intended to harm the inmate. *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019).

> We have held that a generalized risk of violence from a prison population could support a claim of deliberate indifference to a substantial risk of serious harm, the plaintiff has pointed to specific features of a facility or its population rendering it particularly violent. This evidence has included pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence,[20] [fn 20: *See, e.g.*, *Lane*, 835 F.3d at 1307-08 (finding allegations that only one officer supervised two separate dorms, that inmates regularly brought back weapons from their work detail and fashioned them from prison materials, and that officials did not confiscate weapons sufficient); *Hale*, 50 F.3d at 1582–83 (finding potential awareness of a substantial risk of serious harm where a defendant was aware that a prison had severe overcrowding problems and the plaintiff presented evidence that "inmate-on-inmate violence occurred regularly when the jail was overcrowded")] tensions between different subsets of a prison population,[21] [fn 21: *See Lane*, 835 F.3d at 1307-08 (finding potential awareness of a substantial risk of serious harm where a plaintiff alleged that a

8

> particular prison building was composed of 90% gang members, it was common for the non-gang-affiliate inmates or non-Muslim inmates to be robbed or stabbed, and the prison had inadequate supervision to prevent inmates from making homemade weapons)) and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness.[22] [fn 22: *See Cottone v. Jenne*, 326 F.3d 1352, 1355-56, 1358-59 (11th Cir. 2003) (finding potential awareness of a substantial risk of serious harm where mentally ill inmates were separated from the general population but kept in unlocked cells where they could interact with each other, and guards were aware of a particular prisoner's history of violent schizophrenic outbursts).]

*Id.* at 1235.

> [I]t is settled that "a prison official [cannot] escape liability for deliberate indifference by showing that ... he did not know that the complainant was especially likely to be assaulted *by the specific prisoner who eventually committed the assault*," as long as the official was otherwise aware that the victim faced a substantial risk of serious harm.[24] [fn 24: *Rodriguez*, 508 F.3d at 619 (quoting *Farmer*, 511 U.S. at 843, 114 S.Ct. 1970) (alterations in original).]

*Id.* at 1236.

> To be clear, Marbury was not required to identify the person who was threatening him by name, or even necessarily to give the defendants advance notice of a potential attack, so long as other facts put the defendants on notice that he faced a substantial risk of serious harm. It may be possible for a general threat of inmate-on-inmate violence in a prison to bolster an otherwise insufficient unspecified threat of harm.

*Id.* at 1237 (footnotes omitted).

The attack on an inmate by a cellmate in *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), involved an analogous fact situation. In *Cottone*, the mental condition of both the victim and the attacker placed the guards on notice of the risks

9

to the victim and the potential outcomes if the inmates were not properly classified and monitored. Cottone was involuntarily transported to a hospital for observation and then placed in Broward County Jail Unit 1, which housed mentally ill inmates. *Id.* at 1355. The facility was under a consent decree for requirements for classification, monitoring, use of force, and medical care to ameliorate unconstitutional conditions of confinement. *Id*. at 1355.

The attacker, like Brown, had been detained on numerous occasions "due to his violent tendencies" and history of schizophrenia. While in the booking area of the jail he acted violently. A staff psychiatrist placed him in Unit 1 with Cottone and another inmate. Six days later, they found Cottone had been strangled by the violent cell mate. *Id*. at 1356. The guards' motion to dismiss was denied as it was found they had the requisite subjective knowledge of a substantial risk of serious harm to Cottone. *Id.* at 1358.

As for claims against the warden, the *Cottone* court stated the standards for supervisor liability. *Id.* at 1360. Even though plaintiff did not allege that the supervisor "personally participated in the unconstitutional conduct," it was alleged that the jail management was on notice of the widespread unconstitutional conduct by means of the consent decree. *Id*. at 1360-1361. The Court interpreted the consent decree as a factor that could provide the subjective knowledge of the substantial risk to an individual inmate (although in *Cottone* the Court found that supervisors

10

complied with the decree and thus they escaped liability for Cottone's death). *Id.* at 1361.

Like *Cottone's* consent decree, the 2009 DOJ letter to Sherriff Cochran placed him on notice of specific problems with the jail's classification, overcrowding, inadequate training, and other deficiencies which embodied the substantial risks that in fact led to Joshuas injuries.

The motion to dismiss of defendants Cochran and Oliver argues that plaintiff's allegations fail to establish the requisite subjective knowledge of an excessive risk to inmate safety. First, they complain that plaintiff does not include "more detail" regarding a TV interview Oliver gave about plaintiff's assault or regarding a 2009 DOJ letter and argue these cannot be used to show they were on notice of an excessive risk. [PageID.159] This is a motion to dismiss, however, not a motion for summary judgment, and "[t]he plaintiff is the master of the complaint." *United States v. Jones*, 125 F.3d 1418, 1428 (11th Cir. 1997)).

More fundamentally, defendants' quibbles about how plaintiff's complaint is drafted cannot change the fact that the DOJ letter from which plaintiff quotes provides ample notice of an excessive risk of inmate-on-inmate violence. Defendants certainly have a copy of the DOJ letter (one is also available online https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/MCMJ_findlet

11

 01-15-09.pdf). Presumably defendants do not file it with the Court or submit counter-quotations from it because plaintiff has accurately stated facts from it.

And those facts are devastating for defendants. The 2009 DOJ letter specifically identified an ongoing inmate-on-inmate violence problem and specifically related that problem to 1) overcrowding, which is worse by hundreds of inmates today, and 2) the lack of a classification system to separate violent from non-violent inmates at the jail. [Second Amended Complaint ¶¶51-60, PageID.146-48] The following is just one example of the written findings DOJ provided to Sheriff Cochran and Mobile County:

> Specifically, our review revealed that [the jail] failed to: take adequate measures to limit the introduction of contraband [including "shanks"] into the facilities; classify inmates appropriately based on their anticipated in-custody behavior; and supervise inmates adequately. Such failures significantly increase the risk of violence, placing both inmates and staff at risk of serious harm. The security, supervision, and protection from harm deficiencies at [the jail] were exacerbated by a lack of adequate policies, procedures, training, and staffing. (p.30)

Cochran and Oliver also complain that plaintiff has failed to identify a sufficient number of specific inmate-on-inmate assaults (only 2 in addition to plaintiff's own). [PageID.159-60] Plaintiff, however, has alleged ongoing issues with inmate-on-inmate violence, including stabbings. [Second Amended Complaint ¶¶67, 71 PageID.149], and there is no requirement that plaintiff provide such details, *Lane*, 835 F.3d at 1307 (relying upon plaintiff's allegation of "numerous stabbings

and beatings"); *Danley v. Allen*, 540 F.3d 1298, 1315 (11th Cir. 2008) (accepting plaintiff's allegation, unsupported by any specific incidents other than the plaintiff's, that "the jailers at the Lauderdale Detention Center 'regularly used pepper spray excessively as a means of punishment and not for legitimate reasons.'"). Moreover, as Judge Marks in the Middle District recently held, leeway should be allowed in pleading when the information necessary to prove the case is in the exclusive control of the defendant, as specific inmate assault details would be. *See Robinson v. Alexander City, et al.*, 3:18-cv-156-ECM[WO], Doc. 23 [Ex. A, PageID.88-99].

Evidence similar to plaintiff's allegations was found sufficient to deny summary judgment in *Hale*, which, like this case, involved a county jail that was overcrowded and lacked a classification system. The Court found that "Hale's evidence [was] sufficient to support a reasonable jury determination that the excessive risk of violence flowed from an atmosphere of deliberate indifference reflected in [the sheriff's] failure to classify or segregate violent from non-violent inmates, assign inmates to cells or beds, adequately train the jailers, and adequately supervise and monitor the inmates." 50 F.3d at 1584-85.

While the Eleventh Circuit has made clear that *Hale* should not be treated as "the proverbial 'floor' of liability," *Purcell ex rel. Estate of Morgan v. Toombs County, Ga.*, 400 F.3d 1313 (11th Cir. 2005), plaintiff's allegations are close enough to the evidence in *Hale* to make clear that plaintiff has alleged a plausible

supervisory liability claim. Plaintiff has alleged that defendants currently operate a "dangerously overcrowded" jail that has an ongoing inmate-on-inmate violence problem without any inmate classification system despite these systemic issues being pointed out by the U.S. Department of Justice years earlier. *See Q.F.*, 768 Fed. Appx. 946 (in affirming denial of motion to dismiss by district court, citing DOJ memo of understanding which, "although not in force at the time of the alleged constitutional violations, informed the defendants that Eastman was understaffed and that high inmate-to-guard rations increase the risk of inmate-on-inmate violence").

Because plaintiff has plausibly alleged "that the defendants subjectively knew that [Joshua] faced a substantial risk of assault by another inmate and unreasonably disregarded that known risk," "[a]t the Rule 12(b)(6) stage, the defendants are not entitled to qualified immunity." *Q.F.*, 768 Fed. Appx. at 947.

### C. Plaintiff Has Plausibly Alleged a Failure-to-Train Claim Against Cochran and Oliver.

The standard for a failure-to-train claim is essentially the same as the supervisory liability claim. Unless the need for training is obvious, a plaintiff must plead facts showing notice of a need for training by a pattern of abuse, deliberate indifference to the need for training, and causation. *See Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998). For the same reasons plaintiff has stated a failure-to-protect supervisory liability claim based on the lack of a classification system, he

has stated a plausible failure to train claim based on Cochran's and Oliver's failure to train detention officers to classify inmates so that violent inmates are separated from non-violent ones like Joshua.

### D. Plaintiff Has Plausibly Alleged a Claim Against Mobile County in a Complaint that Complies with the Federal Rules.

A county which is aware of dangerous conditions to an inmate will have violated that inmate's rights "if its failure to maintain the Jail constituted deliberate indifference." *Marsh v Butler County*, 268 F.3d 1014, 1027 (11th Cir. 2011) (en banc). In *Moore v. Morgan,* 922 F.2d 1553 (11th Cir. 1991), the Eleventh Circuit favorably addressed a plaintiff's claim based on the failure of an Alabama county to build an adequate facility for the inmate population:

> In this case, faced with the duty of maintaining the county jail, Chambers County failed to satisfy its constitutional responsibility. In 1982, when the Chambers County jail began to become overcrowded, the sheriff and the county commissioners discussed ways to solve the space problem. The county authorized a study to explore the possibility of constructing a new jail, but took no action at that time. In August, 1986, the sheriff again approached the county commission and requested that the county take action on funding a new jail. The commissioners authorized a straw vote to be placed on the November 5, 1986 ballot. By this vote, the citizens chose to construct a new jail and to finance it through the use of a one-cent sales tax. The commissioners then asked the state legislative delegation to introduce legislation for a binding referendum on the jail and the new jail funding issue, but the delegation did not do so. The Chambers County legislative delegation informed the county commission that it would not introduce any legislation authorizing the county to levy a new tax unless the voters approved it in advance by referendum. On March 8, 1988, by

> referendum, the voters overwhelmingly rejected the proposal to levy a tax to build a new jail.
>
> After Moore brought this case against the county, however, the commissioners bought a facility to house 25 inmates, authorized the hiring of 4 jailers, and by cutting funding from other county agencies provided funds to construct a new jail facility with 100 to 200 beds. Construction of a new jail was ultimately financed by a bond issue to be retired by legislatively-enacted tangible personal property rental taxes, excise taxes, and assessments to costs in criminal court cases. The ways in which the commissioners actually obtained the money to finance the necessary jail improvements, when put under the threat of litigation, provides compelling evidence of the fact that the commissioners could have taken steps to improve the jail at a much earlier date. The commissioners' policy of delayed action, and the unconstitutional conditions in the jail that resulted, render the commissioners liable in their official capacities, and consequently the county, liable. *Monell*, 436 U.S. 658 (1978).

*Id*. at 1556-57 (footnote omitted).

Here, plaintiff has alleged a dangerous housing crisis, a housing crisis that was ignored by county policymakers. [Second Amended Complaint ¶¶52-57, 68-70, PageID.146-47, 149] County policymakers, by 2009 at the latest, were aware that the jail was "dangerously overcrowded," that the MCMJ's lack of space for the inmate population limited the ability of jail personnel to keep dangerous inmates like Brown separate from vulnerable inmates like Joshua. Today, the jail is hundreds of additional inmates more overcrowded. Further, during the news coverage of the attack upon Joshua, Warden Oliver stated that a contributing cause for the assault on Joshua with a knife was inadequate physical space for inmates being processed into MCMJ, of which the Mobile County Commission had been aware for years. Thus,

plaintiff has plausibly alleged that county policymakers, acting with deliberate indifference, have failed to take steps to do the primary thing within their power—provide a facility that can safely house the inmate population. Accordingly, plaintiff has stated a claim against Mobile County.

Mobile County also calls plaintiff's complaint a shotgun pleading. Plaintiff's complaint, however, is not just a series of legal counts, as in the shotgun pleading model. Rather, plaintiff's second amended complaint is built upon the firm foundation of a detailed factual section that makes crystal clear who did what and why each defendant is liable. As a Northern District Judge explained,

> So-called "shotgun" pleadings violate either Federal Rule of Civil Procedure 8(a)(2)–which requires "a short and plain statement of the claim showing that the pleader is entitled to relief" by "fail[ing] to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests," *Weiland v. Palm Beach Sheriff's Department*, 792 F.3d 1313, 1323 (11th Cir. 2015) (alterations supplied)–or the requirement of Rule 10(b) that discrete claims should be pled in separate counts. *See Anderson v. District Broad of Trustees*, 77 F.3d 364, 366-67 (11th Cir. 1996).

*Roney v. City of Huntsville, Alabama*, No. 5:18-CV-1482-CLS, 2018 WL 6326483, at *2 (N.D. Ala. Dec. 4, 2018). Plaintiff's second amended complaint, to the contrary, is specific regarding the conduct of each defendant (or similarly-situated group of defendants) and does not just lump all defendants and all conduct together.

## RELIEF REQUESTED

For the above-stated reasons, the Court should deny defendants' motions to dismiss.

Respectfully submitted this 30th day of December, 2019.

        *s/ Henry Brewster*
        Henry Brewster (BREWH7737)
        HENRY BREWSTER, LLC
        205 North Conception Street
        Mobile, Alabama 36602
        Tel: 251-338-0630
        Email: hbrewster@brewsterlaw.net

        *s/ Henry F. (Hank) Sherrod III*
        Henry F. (Hank) Sherrod III (SHERH1200)
        HENRY F. SHERROD III, P.C.
        119 South Court Street
        Florence, Alabama 35630
        Phone: 256-764-4141
        Fax: 877-684-0802
        Email: hank@alcivilrights.com

        ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

I certify that on the 30th day of December, 2019, the foregoing document was filed using CM/ECF system, which will send notice to all parties:

Jay M. Ross
Jay.ross@arlaw.com

Neal C. Townsend
Neal.townsend@arlaw.com

K. Paul Carbo, Jr.
Paul.carbo@atchisonlaw.com

Michael M. Linder, Jr.
Michael.linder@atchisonlaw.com

*/s/Henry Brewster*